FILED
United States Court of Appeals
Tenth Circuit

June 18, 2026

Christopher M. Wolpert
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

ROBERT SUTHERLAND MACLEAN,

    Defendant - Appellant.

No. 25-4126
(D.C. No. 2:23-CR-00153-DAK-1)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **BACHARACH**, and **EID**, Circuit Judges.
_____

A federal jury convicted Robert MacLean of abusive sexual contact while in the special aircraft jurisdiction of the United States, in violation of 18 U.S.C. §§ 2244(b) and 2246(3), and 49 U.S.C. § 46506. He now appeals that verdict. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

## I.    BACKGROUND

According to the evidence introduced at trial, "W.J." took a flight from Chicago to Salt Lake City on the evening of March 1, 2022. She was traveling on business. Due to her frequent-flyer status, the airline upgraded her to first class. She sat in a window seat. MacLean sat next to her in the aisle seat. W.J. and MacLean had never met before. They introduced themselves and made small talk.

After the flight was underway, the flight attendant came by to offer a complimentary drink. W.J. ordered a vodka cranberry. MacLean ordered the same. When the flight attendant came by for the second drink service, W.J. declined but MacLean ordered another and encouraged W.J. to do so as well, using words to the effect of, "Oh, come on, you can have one, too." Aplt. App. vol. III at 32 (internal quotation marks omitted). According to the flight attendant, MacLean also "put his hand on [W.J.'s] knee, like come on, like, you know, just a very friendly gesture to have a drink." *Id.* at 177. W.J. does not remember MacLean touching her knee. In any event, she again declined a second drink.

W.J. likes to knit, so she started working on a knitting project she brought with her. Not long after, MacLean leaned over the approximately eight-inch-wide armrest, slipped his right arm under W.J.'s left arm, and leaned his head very close to her left shoulder. W.J. said it felt like MacLean had "snuggled into [her] arm." *Id.* at 33. He asked W.J. to teach him how to knit. W.J., very surprised, simply explained she was making a sweater for her daughter. After a few seconds, MacLean disengaged but

2

dragged the back of his hand, with pressure, across W.J.'s left breast. W.J. became very tense, but she reasoned it might have been an accident and did not say anything.

Not long after, MacLean leaned over and grabbed one of W.J.'s breasts, i.e., closing his fingers around it, not just brushing against it. W.J. pushed MacLean's hands away, saying, "Listen, pal, keep your hands to yourself." *Id.* at 36 (internal quotation marks omitted). MacLean apologized and explained that he found W.J. "very attractive" and "sexy." *Id.* at 36–37 (internal quotation marks omitted). W.J. slid in her seat as far toward the window as she could. MacLean nonetheless reached under her arm and grabbed her breast again. Tears began to well up and she said to MacLean, "Please just leave me alone. Please don't touch me." *Id.* at 41. She pushed his arms away again, but he grabbed her breast again, and she once again pushed him away.

After this fourth unwanted touching (i.e., the backhand drag plus the three unambiguous instances of grabbing), MacLean got up and went to the lavatory. W.J. then summoned the flight attendant and asked her, "Can you please stop serving him alcohol? He's getting really handsy and I'm very uncomfortable." *Id.* at 44. According to W.J., the flight attendant said she had already been reluctant to serve MacLean more drinks, but she then walked away into the main cabin without saying or doing anything more.

MacLean returned from the lavatory about ten minutes later. Soon after, he reclined and appeared to go to sleep. W.J. felt she could "let [her] guard down a little bit." *Id.* at 48. But soon after, MacLean reached over and squeezed her breast again.

3

She felt torn between "standing up and causing a scene," *id.*, and the humiliation she might feel for doing so.

MacLean again leaned back in his seat and appeared to be sleeping. W.J. began to cry. The flight attendant reappeared and seemed about to disturb MacLean because he was not wearing his mask, in violation of the airline's covid protocols then in effect. W.J. asked her not to wake MacLean. The flight attendant walked away, but soon returned and handed W.J. a note written on a napkin. The note asked if W.J. was comfortable sitting next to MacLean and if she wanted police to meet the plane when it landed. W.J. responded, "I feel like an idiot but he's groping me . . . . I'll just stay on the plane until he gets off. I don't want to cause a scene. . . . I'm good if he's sleeping." *Id.* at 53 (internal quotation marks omitted).

MacLean continued (apparently) to sleep until the captain turned the seatbelt sign on as the aircraft began its descent. MacLean then opened his eyes, twisted toward W.J., and put one hand on each breast, saying, "We need to get you in a seatbelt." *Id.* at 56 (internal quotation marks omitted). W.J. was already wearing her seatbelt. She pushed his hands away again, and she again began to cry.

The plane landed soon after. MacLean quickly stood up, grabbed his things, and was either the first or second person to exit. W.J. stayed on the plane until all the other passengers had exited.

The next day, W.J. called the Salt Lake City Police Department and reported what had happened to her. Five days after that, she also called the FBI to report the incident. And six days after that, she had an in-person interview with an FBI agent.

4

## II.    PROCEDURAL HISTORY

In April 2023, a little over a year after the incident, a grand jury in the District of Utah returned the indictment against MacLean that began this proceeding. The indictment contained a single count of abusive sexual contact in the special aircraft jurisdiction of the United States. Abusive sexual contact is defined as "the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person." 18 U.S.C. § 2246(3). In MacLean's case, the grand jury alleged "the intentional touching through the clothing of the breast of another person, W.J." Aplee. Suppl. App. at 14.

The case went to trial in July 2025. The jury heard from W.J., the flight attendant, and the government's case agent. It found MacLean guilty. The district court later sentenced MacLean to fifteen months' imprisonment. This appeal timely followed.

We provide further detail as it becomes relevant to the arguments discussed below.

## III.    ANALYSIS

### A.    The District Court's Ruling Regarding the Salt Lake City Police Department's Report

MacLean first argues the district court improperly curtailed his cross-examination of W.J. We do not agree.

5

1.    Additional Background

During cross-examination, the defense confronted W.J. with the claim that her testimony of six unwanted touchings was inconsistent with what she told the Salt Lake City Police Department the day after the incident.  The defense asked, "[Y]ou told the [Salt Lake City police] officer that Mr. MacLean had touched your breasts only twice; isn't that right?"  Aplt. App. vol. III at 95.  W.J. denied this and insisted she had reported six unwanted touchings.  The defense attorney then "direct[ed] [W.J.'s] attention to the Salt Lake City Police report summarizing [her] March 2nd, 2022, interview," and stated (presumably to a trial assistant), "You can publish it to the jury."  *Id.*

The report had not been admitted into evidence.  The prosecution immediately objected and asked for a sidebar, which the court granted.  The prosecution explained that the report should not be considered W.J.'s own statement and "[y]ou cannot post or publish something that is not hers."  *Id.* at 96.  After some discussion about that argument, the defense asserted that "[t]here cannot be any problem with showing her something and asking her to look at it," and further stated, "I haven't asked to admit [it] to the jury."  *Id.* at 97.  After more discussion, the court ruled, "It is unfair to ask [the witness] . . . to confirm a statement that isn't hers.  Get the officer [who took the statement] in here and ask them."  *Id.* at 99.  The court accordingly prohibited the defense from showing the police report to W.J.

After trial, MacLean submitted a written motion for a new trial.  He argued that the district court's ruling had violated his Sixth Amendment confrontation right,

6

especially considering that W.J.'s credibility was the most important feature of his defense. He reemphasized, however, that he "was not attempting to introduce the report into evidence." Aplt. App. vol. I at 69. The district court denied the motion.

2.    Discussion

MacLean argues the district court's ruling violated his Sixth Amendment confrontation right. "We review de novo [a defendant's] claim that his Sixth Amendment confrontation rights were violated by the district court's cross-examination restriction." *United States v. Woodard*, 699 F.3d 1188, 1193 (10th Cir. 2012). Alternatively, MacLean argues the district court committed nonconstitutional evidentiary error. "We review evidentiary decisions for abuse of discretion." *United States v. Silva*, 889 F.3d 704, 709 (10th Cir. 2018).

MacLean says that "[b]y prohibiting the defense from showing W.J. the police report so that she could explain, deny, or even just acknowledge her prior statements, the court effectively cut off all attempts by defense counsel to complete the impeachment and foreclosed the ability of the defense to admit the report." Aplt. Opening Br. at 13. But in the district court he explicitly disclaimed this last purpose—admitting the report into evidence—meaning he waived the argument, *see United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019) ("[W]hen a party intentionally relinquishes or abandons an argument in the district court, we usually deem it waived and refuse to consider it." (internal quotation marks omitted)). In this light, MacLean must convince us there is a constitutional right, or at least an evidentiary right, to "complete the impeachment" by showing a witness the document

containing the witness's prior inconsistent statement so she can "explain, deny, or even just acknowledge her prior statements," Aplt. Opening Br. at 13—even where the jury will never see the document allegedly containing those statements.

As to a constitutional right, MacLean offers no authority other than generic discussions in case law about the Sixth Amendment confrontation right and the importance of cross-examination in securing that right.  This does not convince us there is a Sixth Amendment right to show a witness a document allegedly containing the witness's prior inconsistent statements.  We therefore reject MacLean's claim that the district court's ruling violated his constitutional rights.

As to an evidentiary right, MacLean points to Federal Rule of Evidence 613(b), which states, "Unless the court orders otherwise, extrinsic evidence of a witness's prior inconsistent statement may not be admitted until after the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it."  This rule is irrelevant because MacLean disclaimed intent to admit the police report into evidence.  We further note subsection (a) of the same rule, which states, "When examining a witness about the witness's prior statement, a party need not show it or disclose its contents to the witness."  Thus, if Rule 613 grants any right, it is a right *not* to show the allegedly impeaching document to the witness.

All that said, we recognize that no one but W.J. witnessed the conduct charged in the indictment.[1] Thus, MacLean's defense theory largely hinged on W.J.'s credibility, and impeaching her with prior inconsistent statements was an important part of his trial strategy. We further recognize there may have been added impeachment value if MacLean's attorneys could have shown W.J. the police report, even if they never intended to admit the report into evidence. If the document really says what MacLean represents, then presumably W.J. would have acknowledged as much but claimed the police officer must have misunderstood her or misremembered her allegations as he was typing his report.

Even so, the district court did not prevent the defense from asking questions about the report (which the defense did), and the district court even invited the defense to call the officer who created the report as a witness.[2] The defense also brought out numerous other inconsistencies, such as through cross-examining W.J. about other reports she had made to law enforcement, and by comparing W.J.'s testimony with that of the flight attendant and the case agent. Thus, assuming the

---

[1] In the latter half of the flight, the flight attendant saw W.J. crying and showing other signs of distress, but she did not see MacLean touch W.J. other than the one time on the knee, when he encouraged her to order a second drink. The government did not attempt to contact the other passengers who were in the first-class cabin until a couple of months before trial (i.e., about three years after the incident), and the few passengers who responded had no specific memory of that flight or did not remember seeing anything unusual.

[2] The defense in fact did something similar, calling the government's case agent as a witness and pointing out inconsistencies between the case agent's report and W.J.'s testimony. Nothing in the record explains why the defense did not do the same with the Salt Lake City police officer who took the initial report.

district court was wrong to rule that it would be unfair to ask a witness to confirm or deny a police report purporting to reflect that witness's prior statements (a matter we do not reach), that error was harmless because "the substance of the excluded evidence [came] before the court through other means," *United States v. Gould*, 672 F.3d 930, 942 (10th Cir. 2012).

For all these reasons, we see no reversible error in the district court's ruling about the police report.

### B.    The District Court's Rejection of MacLean's Lesser-Included-Offense Instruction

#### 1.    Additional Background

The flight attendant testified that MacLean touched W.J.'s knee while encouraging her to order a second drink. Based on this, MacLean asked the district court to give the jury a lesser-included-offense instruction for simple assault. The district court denied the request because: (i) the deadline to submit jury instructions had passed ten days earlier, so the request was untimely; and (ii) there was not enough evidence for a jury to rationally acquit on the abusive sexual contact charge and convict instead for simple assault. As to the second point, the district court laid out the strength of the evidence that W.J. was groped, just as she claimed.

#### 2.    Discussion

A four-part test governs whether a lesser-included-offense instruction is appropriate:

> (1) [the defendant] properly requested the instruction;
> (2) the elements of the lesser offense are included in the

10

elements of the greater offense; (3) the element differentiating the two offenses is in dispute; and (4) the jury is able to rationally acquit the defendant of the greater offense and convict on the lesser offense.

*United States v. Waugh*, 950 F.3d 665, 667 (10th Cir. 2019). The district court relied on the first and fourth elements of this test to deny the requested instruction. MacLean challenges both parts of the district court's reasoning. "We review the district court's decision for an abuse of discretion." *Id.* Rather than delving into the timing of MacLean's request (element one), we believe it is simpler to focus on whether a jury could have rationally acquitted MacLean of abusive sexual contact and convicted on simple assault (element four). On that, we reach the same conclusion as the district court, although for somewhat different reasons. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("[W]e may affirm on any basis supported by the record . . . .").

Federal law specifies a punishment for "[s]imple assault," 18 U.S.C. § 113(a)(5), but it does not define the offense. MacLean points us to the First Circuit's definition: "'the defendant deliberately touched another in a patently offensive manner without justification or excuse.'" Aplt. Opening Br. at 21–22 (quoting *United States v. Bayes*, 210 F.3d 64, 69 (1st Cir. 2000)). We accept this definition for purposes of this order and judgment. We further accept that, under this definition, any instance of abusive sexual contact ("the intentional touching, either directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse

or gratify the sexual desire of any person," 18 U.S.C. § 2246(3)) would also be an instance of simple assault.

However, just because simple assault is theoretically a subset of abusive sexual contact does not mean a lesser-included-offense instruction is appropriate in every case. MacLean treats the issue as if the question of whether abusive sexual contact or simple assault took place is a question of the entire episode, such as the entire flight from Chicago to Salt Lake City. But as the government points out in its response brief, *see* Aplee. Resp. Br. at 35–39—and as MacLean notably ignores in his reply brief—the crime of abusive sexual contact is not episodic, but granular. Each alleged instance of touching "the genitalia, anus, groin, breast, inner thigh, or buttocks of any person with an intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person," 18 U.S.C. § 2246(3), is a separate offense, *see United States v. Aguilar*, 168 F.4th 1319, 1328 (10th Cir. 2026) (holding that the government may charge "multiple [abusive-sexual-contact] violations involving the same incident" without violating double jeopardy).

In this case, the indictment contained only a single count, not six counts representing the six unwanted touchings to which W.J. testified. Even so, the indictment alleged "the intentional touching through the clothing of [W.J.'s] *breast*." Aplee. Suppl. App. at 14 (emphasis added). The trial evidence showed that the knee-touching was a separate, temporally distinct event, before any alleged contact with W.J.'s breast. Thus, the government could have sought a *separate* charge of simple assault based on the knee-touching incident, but it was not a potentially lesser-

included offense within the abusive sexual contact charge. *See Barrett v. United States*, 607 U.S. 128, 139 (2026) (noting that "the classic relation of the lesser included offense to the greater offense" is that "the very same conduct violates two statutes, one [of] which is fully subsumed within the other" (brackets and internal quotation marks omitted)); *cf. United States v. Benoit*, 713 F.3d 1, 16 (10th Cir. 2013) ("Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior. The doctrine has no application in cases in which two counts are based on two distinct sets of conduct." (citation and internal quotation marks omitted)).

MacLean cites *United States v. Williams*, 197 F.3d 1091 (11th Cir. 1999), in support of his position. *Williams* is unpersuasive in light of (i) this court's precedent about the granular nature of the abusive-sexual-contact inquiry and (ii) the way the government chose to pursue this case.

*Williams* was a case about a computer lab supervisor on a military base who allegedly committed abusive sexual contact on a ten-year-old girl who was using one of the computers. *Id.* at 1092. According to the victim, the defendant touched her leg, chest, buttocks, and vaginal area, and asked for a kiss. *Id.* According to the defendant, however, he accidentally touched the victim's leg as he rolled up next to her in a rolling chair, and he grabbed her shoulders when she was disobeying his instruction to get off the computer. *Id.* at 1092–93. The jury convicted. *Id.*

On appeal, the defendant argued the district court had erroneously refused to give the jury a simple-assault instruction as a lesser included offense. *Id.* at 1095.

13

The Eleventh Circuit agreed that the elements of simple assault fall within the elements of abusive sexual contact. *Id.* The question then was "whether an evidentiary basis exist[ed] for a rational jury to have found Defendant guilty of simple assault but not guilty of abusive sexual contact." *Id.* at 1097. The court answered yes: "a rational factfinder [would have] a sufficient basis upon which to find that Defendant did touch [the victim], and that the touching was offensive and not consented to by her, but that the touching was not of a sexual nature." *Id.* The court therefore vacated and remanded. *Id.*

In context, *Williams* was clearly treating the entire episode—the entire sequence of time in which *some* series of physical contacts with the victim's body admittedly occurred—as the charged offense. That is different as a matter of law from how this circuit treats abusive sexual contact, *see Aguilar*, 168 F.4th at 1328, and it is different as a matter of fact from how the government pursued this case (i.e., based on unwanted touching of W.J.'s breasts, which, according to the evidence, happened after the knee-touching incident). *Williams* is therefore unhelpful in this context.

For these reasons, we conclude the district court did not err when it refused to give a lesser-included-offense instruction based on simple assault.

## IV.    CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Allison H. Eid
Circuit Judge