LUCERO, Circuit Judge.
David Earl Robinson was charged with being a felon in possession of a firearm after selling a gun to a confidential informant (“Cl”). Six days before Robinson’s trial, the government’s star witness — the Cl who purchased the gun from Robinson — was involuntarily committed to a mental health facility. The district court reviewed the Cl’s medical files in camera but refused defense counsel access to them. It also precluded defense counsel from asking the Cl any questions about his mental health history or his use of prescription medications. Robinson was subsequently convicted of violating of 18 U.S.C. § § 922(g)(1) and 924(a)(2) and sentenced to 33 months’ imprisonment.
We must decide if the district court’s refusal to provide Robinson access to the Cl’s medical records contravened due process and whether the court’s limitations on cross-examination of the Cl violated the Sixth Amendment. We answer both questions in the affirmative.
Because of the restrictions imposed by the district court, the jury saw an incomplete and inaccurate picture of the Cl’s credibility. From the jury’s perspective, the Cl had only “a little bit” of a drug problem and was not “regularly” violating his agreement with the ATF by using drugs. By that version of events, the Cl had largely reformed himself after becoming an ATF informant. Further, although the Cl had trouble remembering various details about the events in question, he testified that the only reason for his memory loss was that two years had elapsed by the time of trial. Nothing in the testimony the jury heard suggested that the Cl had a reduced capacity to observe or narrate.
Had defense counsel been permitted to view the medical records and conduct a proper cross-examination, the jury would have seen a different picture. It would have learned that the Cl had been a heavy drug user since 2000 and had recently been abusing alcohol, cannibis, opioids, benzodiazepine, Valium, Klonopin, Darvocet, and Hydrocodone. The medical records contain admissions by the Cl that he had smoked a half-pound of marijuana in a single day shortly before trial and that he had been smoking up to a pound of marijuana per week. The jury would also have heard that the Cl had a “long history of mental illness” starting in 2000, which included auditory hallucinations, seeing “things out through the window that are not really there,” and “hearing voices telling him to do thing[s].” If the jury had been aware of this information, it may well have rejected the Cl’s testimony, without which Robinson could not have been convicted.
Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand.
I
A
After receiving a tip from a Cl, agents with the Bureau of Alcohol, Tobacco, Firearms and Explosives (“ATF”) came to suspect a man named “PJ” of illegally possessing a pistol. An ATF agent requested that the Cl attempt to purchase the gun. When the Cl attempted to do so, however, he learned that PJ had already transferred the gun to Robinson, with whom the Cl was also acquainted. Suspecting the hand *1268 gun to be evidence of illegal activity, the ATF sought to arrange a “controlled buy” from Robinson.
After the Cl set up the purchase, he and an ATF agent drove to Robinson’s home. Before beginning the encounter, the agent searched the Cl for contraband and placed a small audio recording device in his pocket. The Cl then approached Robinson’s home and an adult male, whom the agent could not identify, opened the door to allow the Cl inside. After approximately one minute, the Cl returned to the agent’s car with a handgun. The agent took the handgun, gave the Cl cash, and sent him back inside to pay for the gun. Reentering Robinson’s home, the Cl dropped off the cash and returned to the agent’s car.
Following the purchase, the Cl confirmed, using a photographic lineup, that Robinson was the person from whom he purchased the gun. Robinson, a previously convicted felon, was subsequently indicted for possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).
B
Shortly before Robinson’s trial, the government disclosed that the Cl had been involuntarily committed to Osawatomie State Hospital by his mother, who thought him to be suicidal. The government reported that the Cl would be released in time to testify. Robinson’s counsel then filed a motion requesting the district court to issue a subpoena for the Cl’s mental health records. The district court granted the motion but ordered the Cl’s records to be transmitted directly to the court. In the meantime, the government filed a motion in limine to preclude Robinson’s counsel from inquiring into the Cl’s mental health at trial.
Prior to argument on the motion, at an ex parte, in camera hearing, the court spoke with a psychiatrist at Osawatomie. The psychiatrist relayed his diagnosis of the Cl’s mental status and stated that in his opinion the Cl would be able to testify truthfully. Later, at the in limine hearing, the court ruled, “I am going to ... grant the Government’s motion in limine to preclude [cross-examination on the Cl’s mental condition]. However, I may take it under ... consideration at a later time because the [Cl’s medical] records will be presented to the Court.” It also informed the parties that the Cl had been diagnosed with “poly-substance abuse, mood disorder with an Axis II, temporary, for anti-social traits.”
The next day, the court heard additional arguments regarding the subpoena and the motion in limine. Voicing concern that the Cl’s mental health issues could be used in a “scurrilous effort to discredit” the Cl, the court reaffirmed its previous ruling, concluding the Cl’s mental condition was not material. It suggested that if defense counsel were permitted to question the Cl about his recent treatment, the jury could infer that “there may be something seriously wrong with [the Cl] .... [a]nd for that reason, they’re not going to believe him.”
Robinson’s counsel objected to the court’s ruling, citing United States v. Lindstrom, 698 F.2d 1154 (11th Cir.1988), which held that a district court contravened the Confrontation Clause by narrowly limiting cross-examination as to a witness’s psychiatric history. See id. at 1159-64. The court took Robinson’s cited case law under consideration but did not alter its ruling. Defense counsel also sought a stay pending receipt of the Cl’s medical records, which the court had not yet obtained, but that request was denied.
C
The government’s first witness at trial was the ATF agent who had arranged the controlled buy. He described the process of recruiting and retaining the Cl and *1269 recounted the events surrounding the gun purchase. Next, the government introduced an audio recording captured by the device the Cl carried in his pocket. It was low-quality, interspersed with static, and revealed few details of the events that took place inside Robinson’s home. Despite its limited evidentiary value, the recording does reveal that when the Cl entered Robinson’s home for the second time to drop off the cash, he called out Robinson’s name twice and referred to the handgun’s missing serial number.
Lastly, the government called the Cl to the stand. He confirmed the ATF agent’s account of the controlled buy and testified that Robinson was the man who let him into the house and sold him the gun. On cross-examination, Robinson’s counsel attempted to impeach the Cl by eliciting testimony on his criminal history, the payments he received from the ATF, and the ATF’s intervention on his behalf following “serapefs]” with the law. The Cl stated he was a close friend of the Robinson family, was able to come and go from Robinson’s house as he pleased, and had smoked marijuana with Robinson on the night before the controlled buy. The Cl maintained, however, that he had reformed himself after beginning his work with the ATF. He claimed that he had not “regularly” violated his Cl agreement and insisted he had only “a little bit” of a drug problem. When he was unable to recall certain details about the controlled buy, the Cl testified that the sole reason for his memory loss was the passage of time.
After the prosecution’s case-in-chief, the court reported that it had reviewed the Cl’s medical records in camera and reiterated its ruling that it would not furnish them to Robinson’s counsel. Although the court had previously provided the Cl’s psychiatric diagnosis to the parties, it failed to disclose that the records contained information on the Cl’s abuse of illegal and prescription drugs. Nor did the court apprise the parties that the records contained detailed evidence regarding the Cl’s psychiatric condition. Robinson’s counsel objected to the court’s decision: “[J]ust so the record is very clear, I request, once again, that [the records] be provided to me for review — not for use— but for review with the option of returning [the Cl] to the stand and asking him about them.” Robinson’s objection was overruled.
Robinson argued to the jury that the Cl was lying and had planted the gun in Robinson’s home the night before the buy. His case-in-chief consisted solely of testimony from witnesses called to impeach the Cl. One witness suggested that the Cl had a reputation for dishonesty, and three testified that the Cl had been inaccurate in his recollection of the number of children in the Robinson household.
Robinson was convicted and sentenced to 33 months’ imprisonment. He timely filed this appeal.
II
Robinson first contends that the district court violated the Due Process Clause of the Fifth Amendment by refusing him access to the Cl’s mental health records. Those records reveal three categories of evidence that Robinson claims were material to his defense: (1) illegal drug use by the Cl; (2) the Cl’s mental health condition; and (3) the Cl’s use of prescription medications at the time of trial. “This court reviews de novo whether a defendant’s due process rights have been violated.”[1] United States v. Nickl, 427 F.3d 1286, 1296 (10th Cir.2005).
*1270 The Due Process Clause of the Fifth Amendment provides that “[n]o person shall ... be deprived of life, liberty, or property, without due process of law.” U.S. Const, amend. V. In criminal prosecutions, the clause’s primary guarantee is the right to a fundamentally fair trial. See United States v. Bagley, 473 U.S. 667, 675-76, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); see also Pennsylvania v. Ritchie, 480 U.S. 39, 56, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987); Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Pennsylvania v. Ritchie holds that due process entitles a criminal defendant to have a witness’s potentially privileged records reviewed in camera to determine whether they contain material evidence when the asserted privilege is not absolute but contains exceptions that might allow for disclosure of material evidence. 480 U.S. at 57-58, 107 S.Ct. 989. Amy such material non-privileged information must be disclosed to the defense. Id. at 60, 107 S.Ct. 989.
The district court concluded that the Cl’s records did not contain information material to Robinson’s defense. We cannot agree. “[Evidence is material ... if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome.” Ritchie, 480 U.S. at 57, 107 S.Ct. 989 (quotation and alteration omitted).[2] A defendant need not show that the withheld records would have “resulted ultimately in [his] acquittal.” Kyles v. Whitley, 514 U.S. 419, 434, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Rather, “the touchstone is simply whether *1271 the ultimate verdict is one ‘worthy of confidence.’ ” United States v. Ford, 550 F.3d 975, 993 (10th Cir.2008) (Gorsuch, J., dissenting) (quoting Strickler v. Greene, 527 U.S. 263, 290, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)). This materiality test applies with equal force to both exculpatory and impeachment evidence. Bagley, 473 U.S. at 676, 105 S.Ct. 3375.
We conclude there exists “a reasonable probability that ... the result of the proceeding would have been different” had Robinson been privy to the contents of the Cl’s mental health records and been allowed to cross-examine the Cl on that basis. Ritchie, 480 U.S. at 57, 107 S.Ct. 989 (quotation omitted); see United States v. Torres, 569 F.3d 1277, 1282-84 (10th Cir.2009) (concluding that evidence was material and reversing conviction when government failed to disclose that the Cl, on whose testimony the conviction depended, had been retained by the government as an informant on two prior occasions); Part III A, infra. In weighing the materiality of the medical records, we note that the Cl was the only witness who testified directly to Robinson’s possession; his testimony was central — indeed essential — to the government’s case. He arranged the purchase of the firearm and negotiated the purchase price. He is the only person who interacted with Robinson and the only one who identified Robinson. It is not a stretch to say that the guilty verdict in this case depended upon the Cl’s testimony. See Torres, 569 F.3d at 1282-84; cf. Kyles, 514 U.S. at 441-45, 453-54, 115 S.Ct. 1555 (concluding that evidence was material and reversing for new trial when suppressed evidence could have undermined the credibility of prosecution’s key witnesses).
Little evidence corroborates the key aspects of the Cl’s story. While the audio recording confirms the interaction between the Cl and the ATF agent, it sheds virtually no light on what occurred during the few moments the Cl was inside Robinson’s house. But those few moments are the government’s entire case. Moreover, the “controlled” buy was controlled in name only. It took place entirely outside the view of the ATF agent, and, as the government admits, its audio recording of the event “turned out to be of little evidentiary value.” (Appellee Br. at 27 n. 1.) By claiming that the crucial aspects of the Cl’s story were corroborated, the government “seriously underestimates the extent to which the government’s case rested on the credibility of the Cl. The Cl’s trial testimony was critical to [its] ability to link [Robinson] to the controlled buy.” Torres, 569 F.3d at 1282.
Because the Cl was the only witness who testified about Robinson’s possession and because his testimony was essentially uncorroborated, the Cl’s credibility was of paramount concern. See United States v. Payne, 63 F.3d 1200, 1210 (2d Cir.1995) (“In general, impeachment evidence has been found to be material where the witness at issue supplied the only evidence linking the defendant(s) to the crime.” (quotation omitted)). Given the importance of the Cl’s credibility, we cannot affirm the district court’s conclusion that the medical records did not contain material information. See Torres, 569 F.3d at 1282-83.
These medical records reveal evidence of illegal drug use by the Cl that is far more extensive than the jury was led to believe. At trial, the Cl testified that he had cleaned up his act after beginning work with the ATF and that he was not “regularly” using drugs. The medical records belie this testimony. On his admission to the mental health facility (less than one week before trial), the Cl admitted to using drugs since 2000, including current use of “opio[i]d[s], alcohol, cannibis, and *1272 benzodiazepine.” He claimed to have smoked a half-pound of marijuana a few days prior to admission and told his doctors that he and a friend had been smoking up to a pound of marijuana per week and using street-bought opioids and “benzos.” He reported abusing prescription medications, including Valium, Klonopin, Darvocet, and Hydrocodone.
Evidence of this extensive illegal drug use would have been used to impeach the Cl’s credibility in several ways. It directly contradicts his testimony that he had only “a little bit” of a drug problem and that he was not “regularly” using illegal drugs. Showing that the government’s star witness lied on the stand could well have impacted the jury. Further, the Cl’s agreement with the ATF prohibited him from engaging in criminal activity (including illegal drug use). The jury could have inferred that if the Cl were willing to repeatedly breach the terms of his informant agreement, he might also be willing to testify falsely.
Illegal drug use does not merely bear on the Cl’s veracity but also on his capacity as a witness. “A witness’s credibility may always be attacked by showing that his or her capacity to observe, remember, or narrate is impaired. Consequently, the witness’s capacity at the time of the event, as well as at the time of trial, is significant.” 4 Jack B. Weinstein & Margaret A. Berger, Weinstein’s Federal Evidence, § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2009). Extensive drug use since 2000 suggests that the Cl could have been under the influence at the time of the alleged firearm sale. Moreover, “[i]f the witness was under the influence of drugs or alcohol at the time he testifies, this condition is provable, on cross or by extrinsic evidence, to impeach.” Kenneth S. Broun, McCormick on Evidence § 44 (6th ed. 2006) (alterations omitted). Had Robinson known that the Cl had much more than “a little bit” of a drug problem, he certainly would have explored whether the Cl was using drugs at the time of the alleged sale or at the time of trial. Cf. United States v. Crosby, 462 F.2d 1201, 1203 (D.C.Cir.1972) (district court abused its discretion in denying defense request to subpoena key witness’s medical records when witness was long time drug addict who had used drugs on day of trial).
In addition to the drug use evidence, the Cl’s capacity to testify could have been further undermined by evidence of his mental condition. His medical records reveal that at the time of hospital admission (six days before trial), the Cl was suffering from auditory hallucinations, seeing “things out through the window that are not really there,” and possibly experiencing psychosis. On their face, these diagnoses bear on the Cl’s “ability to perceive or to recall events or to testify accurately.” United States v. Butt, 955 F.2d 77, 82 (1st Cir.1992) (quotation omitted). Robinson’s attempt to access these records was anything but a “scurrilous effort to discredit” the Cl; it was aimed at uncovering legitimate doubts as to the Cl’s capacity as a witness.
These records also show that the Cl was prescribed a variety of medications upon discharge from the hospital — medications the Cl was using at the time of trial. As even the dissent concedes, the Cl’s use of prescription drugs is relevant evidence given its potential to color his testimony, particularly in light of Cl’s insistence that only the passage of time explained his memory lapses.[3] Cf. United States v. *1273 Jones, 213 F.3d 1253, 1261 (10th Cir.2000) (suggesting prescription medications might affect a witness’s “memory, perception, or comprehension”); United States v. Clemons, 32 F.3d 1504, 1511 (11th Cir.1994) (“[A] witness’s use of drugs may not be used to attack his general credibility, but only his ability to perceive the underlying events and to testify lucidly at trial.”).[4]
We are not persuaded by the government and dissent’s reasoning that disclosing the medical records would not have bolstered Robinson’s theory of the case. This argument implies that impeachment evidence is material only if it undermines the credibility of a witness in a manner consistent with the defendant’s position at trial.[5] But here impeachment of the Cl would not have been inconsistent with Robinson’s theory of defense. Indeed, Robinson’s counsel tried, ineffectively without the withheld information, to impeach the Cl.
Disclosing the records may well have bolstered Robinson’s theory. Robinson argued that the Cl planted the gun in his house the night before the controlled buy (the Cl admitted that he was at Robinson’s house smoking marijuana that night). If the jury knew that the Cl had lied about his drug use on the stand, it might have found this theory more plausible. The extreme nature of the Cl’s drug use also provides a motive for the Cl to frame Robinson: continued funding through his ATF informant agreement to support his drug habit.
Moreover, we cannot know whether Robinson’s theory would have been different had he been permitted to review the material evidence in the Cl’s medical files, nor can we determine how the jury would have reacted to such hypothetical arguments. Cf. United States v. Montelongo, 420 F.3d 1169, 1176 (10th Cir.2005) (“[W]e cannot say for certain how much information the Defendants might have elicited from [the witness] on cross-examination, how the jury might have viewed [the witness’s] demeanor on cross-examination, or how persuasive the evidence ... would have been to the jury.”). In light of the substantial evidence calling into question the Cl’s perception and retention abilities, Robinson might have argued that the Cl did not remember the events at issue but was merely parroting the ATF’s version of events.[6]
The evidence contained in the records was not cumulative. Because Robinson was denied access to the records, he was not permitted to argue that the Cl’s drug use, mental health problems, and use of prescription drugs at the time of trial affected his testimony. United States v. Wilson, 481 F.3d 475, 480 (7th Cir.2007) (“[E]vidence that provides a new basis for impeachment is not cumulative and could well be material.”). None of these avenues of impeachment is duplicative of those *1274 Robinson was able and allowed to pursue at trial. See Torres, 569 F.3d at 1284 (“Merely because other impeachment evidence was presented does not mean that additional impeachment evidence is cumulative .... ”).
In sum, viewed against the backdrop of Cl’s centrality to the government’s case, the withheld evidence of the Cl’s extensive drug abuse, his mental health issues, and his use of prescription drugs at the time of trial (whether considered individually or cumulatively) lead us to conclude that the verdict is not “worthy of confidence.”[7] Kyles, 514 U.S. at 434, 115 S.Ct. 1555.
Ill
We next consider whether the district court violated the Confrontation Clause when it forbade Robinson from cross-examining the Cl on his mental health history and his use of prescription medications.[8] “We review de novo whether a defendant’s Sixth Amendment confrontation rights were violated by cross-examination restrictions.... ” United States v. Byrne, 171 F.3d 1231, 1234 (10th Cir.1999) (quotation omitted). We conclude that both cross-examination limitations violated the Confrontation Clause and that the government has not met its extraordinary burden of proving that these constitutional errors were harmless beyond a reasonable doubt. See Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986).
A
The Sixth Amendment guarantees the right of a defendant to “be confronted with the witnesses against him.” U.S. Const, amend. VI. “[A] primary interest secured by [the Confrontation Clause] is the right of cross-examination.” Davis, 415 U.S. at 315, 94 S.Ct. 1105 (quotation omitted). Although a district court may exercise its discretion through reasonable limits on the scope of questioning, “[c]rossexamination is the principal means by which the believability of a witness and the truth of his testimony are tested.” Id. at 316, 94 S.Ct. 1105. A court may violate the Confrontation Clause when it inappropriately “preludes an entire relevant area of cross-examination.” Montelongo, 420 F.3d at 1175 (quotation omitted). As the Fifth Circuit has explained, “Where the witness the accused seeks to cross-examine is the ‘star’ government witness, providing an essential link in the prosecution’s case, the importance of full cross-examination to disclose possible bias is necessarily increased.” Greene v. Wainwright, 634 F.2d 272, 275 (5th Cir.1981) (quotation omitted). Robinson was prohibited from questioning the prosecution’s star witness on two highly relevant topics: the Cl’s mental health and his prescription medication use. We hold that both limitations constitute reversible error.[9]
Evidence that the Cl has suffered from auditory hallucinations and saw “things out through the window that are not really *1275 there” was relevant because it would have “provide[d] some significant help to the jury in its efforts to evaluate the [Cl’s] ability to perceive or to recall events or to testify accurately.” See United States v. Moore, 923 F.2d 910, 913 (1st Cir.1991); see also Fed.R.Evid. 401. So, too, was evidence of his use of prescription drugs at the time of trial. Cf. Jones, 213 F.3d at 1261; Clemons, 32 F.3d at 1511. Moreover, the probative value was not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. See Fed.R.Evid. 403.
This is not a case in which a party attempts to unfairly malign a witness for distant and relatively minor mental health issues. See Moore, 923 F.2d at 912-13 (not an abuse of discretion to refuse to permit inquiry into a witness’s consultation with a therapist ten years prior related to a child’s death). Instead, the present case parallels Greene v. Wainwright, in which the Fifth Circuit granted habeas relief after a trial court prohibited all inquiry into the mental health history of the prosecution’s key witness. 634 F.2d at 275-76. In Greene, the government’s case turned on a single witness’s testimony that Greene sold him marijuana. Our sibling circuit reasoned that “[i]t is just as reasonable that a jury be informed of a witness’s mental incapacity at a time about which he proposes to testify as it would be for the jury to know that he then suffered an impairment of sight or hearing.” Id. at 276.
In this case, the mental health testimony sought by Robinson concerns events that took place just days before trial began, unlike the situation in United States v. Moore, in which the relevant events occurred ten years before trial. See Moore, 923 F.2d at 913. The Cl’s mental health issues also relate directly to his capacity to observe and remember. Cf. id. at 912-13 (visit to a therapist for death of a child not related to witness’s capacity). As in Greene and unlike in Moore, the Cl’s material testimony was wholly uncorroborated. Compare Moore, 923 F.2d at 913, with Greene, 634 F.2d at 275. Also as in Greene, the district court’s cross-examination prohibition here was categorical. See Greene, 634 F.2d at 275. Under these circumstances, the district court erred under Rule 403 by imposing a blanket proscription of cross-examination related to the Cl’s mental health condition and his use of prescription medications.
B
The district court’s refusal to permit any inquiry into the Cl’s mental health history and use of prescription medications violated the Sixth Amendment. As we explained in United States v. Montelongo, “a constitutional violation occurs when the defendant is prohibited from engaging in otherwise appropriate cross-examination that, as a result, precludes him from eliciting information from which jurors could draw vital inferences in his favor.” 420 F.3d at 1175 (quotation omitted).
Although violations of the Confrontation Clause are subject to harmless error analysis, Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431, these errors were not harmless beyond a reasonable doubt. Id. As discussed in Part II, supra, the Cl’s credibility provides the lynchpin of the government’s case: He is the only witness who identified Robinson and his testimony is the only useful evidence linking Robinson to possession of the gun. The jury’s view of his credibility was therefore crucial. See Payne, 63 F.3d at 1210.
Cross-examination into the Cl’s mental health history may have undermined the Cl’s credibility as a witness. As noted above, credibility concerns not only veracity, but the witness’s capacity to “observe, remember, or narrate” both at the time of the trial and at the time of the event. 4 *1276 Jack B. Weinstein & Margaret A. Berger, Weinstein’s Federal Evidence, § 607.05[1] (Joseph M. McLaughlin ed., 2d ed. 2009). Had the jury learned that the Cl had recently admitted to “hearing voices,” “seeing things out the window that [were] not really there,” and experiencing suicidal ideation, it could have reasonably concluded that the Cl had a reduced capacity to observe, remember, and recount. Absent the district court’s restrictions on cross-examining the Cl about his hospitalization, Robinson would have likely revealed these problems with perception and narration, along with the Cl’s “long history of mental illness.” Because these problems deeply compromise the Cl’s credibility and because the Cl was the fulcrum of the government’s case, we cannot conclude beyond a reasonable doubt that the jury would have reached the same verdict had Robinson been allowed to cross-examine the Cl about his recent hospitalization. See Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431.
For similar reasons, the district court’s refusal to allow cross-examination of the Cl regarding his use of prescription medication cannot be deemed harmless. When the Cl was discharged from the mental hospital just before trial, he was instructed to continue to take three medications: 20 mg of citalopram once a day, 500 mg of dicloxacillin four times a day, and 1 mg of risperidone twice a day.[10] Robinson should have been permitted to inquire as to whether these medications affected the Cl’s memory, perception, or ability to narrate the events at issue. Assuming “that the damaging potential of th[is] cross-examination were fully realized,” Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431, the jury may have been much more inclined to disregard the Cl’s testimony.
We have already concluded there exists a “reasonable probability” the jury would have reached a different decision had Robinson been privy to the CPs prescription drug usage; it necessarily follows that the district court’s prohibition on cross-examination regarding the same topic cannot clear the high hurdle of harmlessness beyond a reasonable doubt. See Kyles, 514 U.S. at 435-36, 115 S.Ct. 1555; Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431.
IV
For the reasons stated, we REVERSE Robinson’s conviction and REMAND for further proceedings consistent with this opinion.[11]

. The government and dissent assert that our review of this issue should be confined to plain error. We disagree. The district court was well aware that Robinson sought access to the Cl’s records based in part on due process grounds. In his pre-trial motion to *1270 subpoena the Cl’s records, Robinson invoked United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), in which the Court explained that "the Fifth Amendment ... guarantees that no person shall be deprived of liberty without due process of law. It is the manifest duty of the courts to vindicate those guarantees, and to accomplish that it is essential that all relevant and admissible evidence be produced.” Id. at 711, 94 S.Ct. 3090; see also id. at 712, 94 S.Ct. 3090 ("[T]he allowance of the privilege to withhold evidence that is demonstrably relevant in a criminal trial would cut deeply into the guarantee of due process of law and gravely impair the basic function of the courts.”). Further, in his post-trial "Motion to Permit Inspection of Sealed Medical Documents,” Robinson expressly argued that denying "access to the documents is to deny the defendant ... his right to Due Process of Law guaranteed by the Fifth Amendment.” Perhaps most importantly, in denying Robinson's motions for a new trial and inspection of the records, the district court acknowledged that Robinson had advanced a due process challenge, characterizing his argument as: "[T]he court's refusal to permit ... inspection violates defendant’s ... Fifth Amendment right to due process.”
The waiver doctrine is intended in part to prevent a party from "sandbagging” — holding back arguments in hope of finding a more sympathetic audience on appeal. See Wainwright v. Sykes, 433 U.S. 72, 89, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). When the district court understands a party to have raised a particular argument, that goal is met. See United States v. Pena, 216 F.3d 1204, 1209 (10th Cir.2000) (relying on the district court’s understanding of an argument to determine waiver issue); United States v. Mejia-Alarcon, 995 F.2d 982, 985 n. 1 (10th Cir.1993) (same).
Admittedly, Robinson’s post-trial arguments centered on the Confrontation Clause, but that is hardly surprising. After all, "[a]ccess to the records is ... not [defense] counsel’s ultimate goal; it is an attempt to discover information that can be used to cross-examine the witness at trial, or to provide a basis to call the therapist or counselor as a witness and question him or her about the witness’s condition and treatment.” Clifford S. Fish-man, Defense Access to a Prosecution Witness's Psychotherapy or Counseling Records, 86 Or. L.Rev. 1, 3 n. 1 (2007).

. Ritchie's materiality test was taken from the Court's line of decisions beginning with Brady, 373 U.S. at 87, 83 S.Ct. 1194. Ritchie, 480 U.S. at 57, 107 S.Ct. 989.

. The district court could have allowed defense counsel to explore these issues outside the presence of the jury and to argue their relevance before definitively ruling on their admissibility. See United States v. Mojica, 185 F.3d 780, 788-89 (7th Cir.1999); cf. Fed. R.Evid. 104(a).

. The dissent states that some of the records were privileged and thus inadmissible. Although some of the records may be subject to a claim of privilege, we see no assertion of privilege in the record by the Cl or the prosecution (assuming the government could even claim the privilege on behalf of the Cl). The district court did not rule on the matter, and it is not argued in the parties’ briefs to this court. We also note that any privilege from disclosure has already been eviscerated because Robinson’s counsel apparently reviewed the records in crafting his appellate brief. Whether particular documents would be nonetheless inadmissible is a matter we leave for the district court to decide in the first instance.

. Of course, Robinson is not obligated to present any evidence at all; the government bears the burden of establishing guilt beyond a reasonable doubt. In re Winship, 397 U.S. 358, 364, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970).

. The Cl admitted that he reviewed police reports of the incident prior to testifying.

. Having concluded that the district court denied Robinson due process by refusing to provide access to the material portions of the Cl's mental health records, a further harmless-error analysis is unnecessary. See Kyles, 514 U.S. at 435-36, 115 S.Ct. 1555.

. Because questions regarding the scope of cross-examination are likely to arise on remand, we think it best for us to decide this issue.

. Because the district court did not limit Robinson's ability to cross-examine the Cl regarding illegal drug use, it did not violate the Sixth Amendment in that respect. However, for the reasons discussed above, the court denied Robinson due process by refusing to disclose the Cl's mental health records. See Part II, supra. Had Robinson been given access to those records, no doubt his cross-examination of the Cl as to illegal drug use would have been different.

. There is little in the record about the exact nature or potential side effects of these medications. However, there will nearly always be a lack of evidence on the record about the a particular issue when a defendant’s rights under the Confrontation Clause have been violated by forbidding cross-examination on that issue. In assessing the harm of the Confrontation Clause violation, we must therefore assume "that the damaging potential of th[is] cross-examination were fully realized," Van Arsdall, 475 U.S. at 684, 106 S.Ct. 1431.

. Because we reverse Robinson’s conviction, we need not decide his challenge to being shackled during sentencing or his appeal of his sentence.