**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 25, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

SANDRA COOK,

    Defendant - Appellant.

No. 17-2161
(D.C. No. 1:15-CR-03224-WJ-1)
(D.N.M.)

_____

## ORDER AND JUDGMENT[*]
_____

Before **LUCERO**, **EBEL**, and **PHILLIPS**, Circuit Judges.
_____

Sandra Cook appeals her two convictions for possessing with intent to distribute methamphetamine. She primarily argues that the district court violated the Confrontation Clause by excluding cross-examination of the lead investigating officer about the truthfulness of his search-warrant affidavit in an unrelated drug case. She also argues that the court abused its discretion by excluding evidence she believes would have supported her trial claim that she was a mere tagalong methamphetamine user, not an active buyer and seller in her fiancé's drug enterprise. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

# BACKGROUND

## A. The Investigation

On June 30, 2015, law-enforcement officers with the Bernalillo County, New Mexico Sheriff's Department (BCSD) obtained and executed a search warrant at a house on Alcazar Street in Albuquerque. The target of the search was a woman named Marti Solano, whom the BCSD suspected of dealing large amounts of methamphetamine. Upon arriving at the house, BCSD deputies saw a man walking to the front door. Detective Jerry Koppman, the BCSD's lead investigator on the case, approached the man, who turned out to be Jeffrey Burlingame, Cook's fiancé. Burlingame said that he didn't live at the house. After Burlingame said he didn't have a key to the home, Detective Koppman rang the doorbell.[1]

When Cook answered the door, Detective Koppman asked her where Solano was. Cook responded that Solano was in the basement, so Detective Koppman beelined there. He described Solano's basement bedroom as "messy," "very cluttered," and typical of a methamphetamine user. R. vol. 4 at 184; R. vol. 1 at 143–47. In response to Detective Koppman's questioning, Solano revealed that she had hidden distribution amounts of heroin and methamphetamine in suitcases and containers in her bedroom. During the questioning, one of the deputies notified Detective Koppman that "the lady upstairs"—

---

[1] The landlord, Brian Claghorn, testified that only Cook and Solano lived in the house, Solano in the downstairs bedroom. Claghorn added that, although Cook usually paid the rent, Burlingame had access to the home and had paid the rent "a couple of times." R. vol. 4 at 572, 582.

Cook—"want[ed] to leave" because she had some kind of appointment. R. vol. 4 at 224. But Detective Koppman ordered that no one leave the house until the BCSD had completed its search and instructed the deputies to keep Cook and Burlingame seated on the living-room sofa until he finished questioning Solano. Detective Koppman then offered Solano an opportunity to cooperate. After initially hesitating, Solano pointed upstairs and whispered that Cook was her methamphetamine supplier.[2]

Detective Koppman testified that he "hustled upstairs," took a woman he encountered into a room, and told her that he knew she supplied Solano. When the woman shook her head and said he had the "wrong one," Detective Koppman realized he was not speaking to Cook (in fact, he was speaking to a woman named Lara Baca). *Id.* at 195–96**.** Detective Koppman then found Cook, still sitting on the couch upstairs, and confronted her about being Solano's methamphetamine supplier. Cook reacted with what he thought was feigned ignorance. When deputies searched the red purse that Cook was carrying, they found a usable quantity of methamphetamine and several bundles of cash. Meanwhile, Detective Steven Cotton led other BCSD deputies in searches of Cook's upstairs bedroom and of an adjacent upstairs bedroom (the southeast bedroom). The southeast bedroom had no bed and appeared to serve as an office and storage area. In the closet of the southeast bedroom, Detective Cotton found over six pounds of

---

[2] Solano did not testify at trial. To avoid a hearsay problem, the court instructed the jury to consider Solano's statement to explain only why Detective Koppman went upstairs, and not for the truth of the matter asserted.

methamphetamine; several thousand dollars in cash; and chemistry books, including one entitled *Amphetamine and Its Analogs*.

Several things led BCSD deputies to believe that the southeast bedroom belonged to Cook. First, the southeast bedroom was next to the bedroom that BCSD deputies believed Cook inhabited. Second, unlike Solano's basement bedroom, the southeast bedroom was neat and tidy. Third, in the drawers of a built-in cabinet along the southeast bedroom's wall, deputies found Cook's driver's license and Social Security card. Fourth, the southeast bedroom's closet contained several ladies' handbags that resembled the red purse that Detective Koppman testified to having found Cook holding.[3]

The BCSD deputies arrested Cook and took her to a substation for booking. On the drive to the substation, Detective Koppman explained to Cook the benefits of cooperating in the investigation. About 45 minutes into his typing a criminal complaint, Detective Koppman learned from another detective that Cook "wanted to talk."[4] R. vol. 4 at 231. Detective Koppman then grabbed Sergeant Brad Cooksey, and they went to see Cook. Detective Koppman testified that during the ensuing talk, Cook admitted that she

---

[3] Cook maintains that the evidence was ambiguous about whether the southeast bedroom belonged to her. But additional facts further indicate that she occupied and controlled the southeast bedroom. First, Cook paid the rent, suggesting that she sublet the downstairs bedroom to Solano. In addition, a few days after the search, Cook asked the landlord to remove Solano's things from the downstairs bedroom because Cook did not have access to that locked room. Taken together, these facts show that Cook controlled the upstairs area—including the southeast bedroom—and that Solano controlled the basement.

[4] Sergeant Cooksey testified that Koppman "wanted to interview Ms. Cook one more time to see if [he] could get her cooperation." R. vol. 4 at 341.

worked as a distributor for the Sinaloa Cartel in Mexico. Though not testifying, Cook denies on appeal ever making such a statement.

As mentioned, Sergeant Brad Cooksey was also in the room when Detective Koppman interviewed Cook. At Cook's trial, Sergeant Cooksey testified that he "[did not] really recall the exact conversation, because [he] was on the phone a lot with some other agencies," but that he heard Cook mention "a source of supply from Phoenix providing the methamphetamine to [her] and [her] potential[] willing[ness] to assist [the BCSD] in getting that target." R. vol. 4 at 342. At some point, realizing that the drug activity reached across the state border, Sergeant Cooksey began making calls to "gather some resources." *Id.* Detective Koppman did not record Cook's statement. When asked why he had not done so, he testified that he had acted within his usual practice of protecting suspects whom he is trying to "flip"—that is, if such a recording ever became public, the Sinoloa Cartel might try to kill Cook. *Id.* at 232–33.

Despite having seized six-plus pounds of methamphetamine and over $20,000, Detective Koppman did not oppose Cook's release on bond. At trial, he explained this decision by noting that Cook had agreed to help the BCSD investigate her suppliers. As part of her cooperation, he and she communicated by telephone. At trial, the government admitted into evidence the phone-company records of these calls. Koppman testified that Cook gave him some valuable information, but that she eventually "flake[d] out" and stopped responding to his phone calls. *Id.* at 267. So the BCSD turned over her case to federal agents at Homeland Security Investigations (HSI). The federal government later obtained an indictment against Cook and secured an arrest warrant for her.

5

After consulting with Customs and Border Protection (CBP) officials, HSI agents obtained information leading them to believe that Burlingame and Cook had recently entered the United States from Mexico, with Cook using a birth certificate with the name Lara Baca. The CBP's surveillance video shows Burlingame and a woman who appears to be Cook entering a pedestrian crossing at Nogales, Arizona.[5] After HSI agents learned from an informant that Cook was staying at a house on Habanero Way in Albuquerque, they obtained and executed a search warrant there. Inside, they found Cook and Burlingame with methamphetamine residue and drug paraphernalia spread out on a table. On the table, the agents found a tool bag containing about a pound of methamphetamine, a birth certificate and two photo identification cards for Lara Baca, and Cook's New Mexico driver's license. Cook was standing about two to three feet away from the tool bag. In the living room, the agents found a smaller amount of methamphetamine hidden in the couch and two books: *How to Disappear, Erase Your Digital Footprint, Leave False Trails, and Vanish without a Trace* and *How to Disappear Completely and Never Be Found*. The agents also found a loaded pistol and ammunition in Burlingame's backpack.

The same day as the Habanero Way search, HSI agents executed a search warrant for Burlingame's home on Dungan Street in Albuquerque. There, they found disassembled laboratory equipment containing an unidentified residue, six firearms, and several prepaid "burner" phones. They also found Cook's "Order Setting Conditions of

---

[5] The record doesn't reveal whether CPB officers inspected Burlingame or Cook when they entered, or whether they were carrying any drugs at the time.

Release" from her New Mexico state criminal case, which listed the Dungan Street house as her home address.

Cook was arrested and charged with a second count of possession with intent to distribute methamphetamine.[6] While in jail, Cook placed a recorded phone call to Burlingame, telling him not to give the police any information because "they're trying to divide and conquer [us]," and advising him that she would "take all the charges." R. vol. 4 at 444–45. Cook and Burlingame were not charged with conspiracy and were separately prosecuted. Burlingame pleaded guilty to one count of possession with intent to distribute methamphetamine and one count of carrying a firearm during and in relation to a drug trafficking crime. After Burlingame's sentencing, Cook went to trial.[7]

## B.  Pretrial Motions, Trial, and Sentencing

Before trial, the government sent Cook's counsel a letter advising of an issue with Detective Koppman's search-warrant affidavit in a different, contemporaneous investigation of a suspected drug dealer (a man we will call Mr. Doe). In this affidavit, Detective Koppman stated, accurately, that one of his confidential informants, CS2, had told him that Mr. Doe worked for an identified person, whom another detective described to Detective Koppman as a large-scale supplier. But according to the government's letter,

---

[6] The first count was based on evidence collected during the Alcazar Street search, while the second was based on the Habanero Way search. Cook was not charged with anything found at the Dungan Street search.

[7] Solano was at large at the time of Cook's trial.

Detective Koppman knew that this was wrong, because the person CS2 had named as the person Mr. Doe worked for was, in fact, Detective Koppman's other informant, CS1. Even more telling, Detective Koppman had used CS1 to purchase drugs from Mr. Doe in a controlled buy. The government's letter acknowledged that Detective Koppman had known that Mr. Doe did not work for CS1 but that he had included that information anyway.[8]

The magistrate judge issued a search warrant for Mr. Doe's home, which was followed by a federal prosecution of Mr. Doe. But for reasons undisclosed by the record, the government later dismissed the charges.

At the same time it sent Cook's counsel the letter, the government moved for an order prohibiting Cook "from raising the issue of Detective Koppman's search warrant affidavit [in Mr. Doe's case] in any manner" at any point in the proceedings. Suppl. R. vol. 1 at 17–28. Because the district court didn't hold an evidentiary hearing on the matter (no one asked it to), our knowledge of the facts is limited to the information contained in the government's disclosure letter and the affidavit itself. The affidavit spans five pages. The informant's mistaken report of who supplied Mr. Doe takes one sentence. Based on the government's letter, we know: (1) that CS2 told Detective Koppman that CS1 supplied drugs to Mr. Doe; (2) that Detective Koppman knew that this information was wrong because, unknown to CS2, the person he named as Mr. Doe's source was

---

[8] Though we are uncertain why CS1 could not occasionally buy drugs from his usual customer, we accept the government's admission that CS1 was not Mr. Doe's supplier.

CS1; and (3) that Detective Koppman recounted both informants' statements without alerting the court that CS2 was mistaken about the identity of Mr. Doe's supplier.

The district court granted the government's motion, concluding that Detective Koppman's inclusion of CS2's mistaken belief about the identity of Mr. Doe's supplier was not probative of Detective Koppman's character for untruthfulness under Federal Rule of Evidence 608(b). Specifically, the court found that, because Detective Koppman had conducted a controlled purchase from Mr. Doe, the affidavit established probable cause for a warrant even with CS2's single erroneous statement removed. In that circumstance, the district court determined, Detective Koppman would have had no motive to mislead the magistrate judge. The court also concluded, under Federal Rule of Evidence 403, that allowing cross-examination about the search-warrant affidavit would confuse the jury and waste time. Consistent with its order, the court precluded Cook from questioning Detective Koppman about the affidavit.[9]

The district court also prevented Cook from offering other evidence she claims was necessary to present her defense. At trial, Cook sought to admit evidence of the Dungan Street search and Burlingame's plea agreement. Cook argued that the items found at the Dungan Street house indicated that Burlingame was operating a methamphetamine lab without Cook's involvement. (As mentioned, Cook had listed the

---

[9] The court first prevented Cook from cross-examining Detective Koppman about the affidavit during the suppression hearing. Although Cook raised a Confrontation Clause objection in her brief opposing the government's motion, the district court conducted no Confrontation Clause analysis in its order granting the government's motion. Rather, the district court relied on Rules 608(b) and 403.

Dungan Street house as her residence in her state-court release papers.) But the court excluded the seized items as irrelevant because the government had not charged Cook and Burlingame as coconspirators and because Cook was not charged based on anything found at the Dungan Street house. Cook also sought to introduce Burlingame's plea agreement for the same purpose, to show that Burlingame ran the drug operation. In the agreement, Burlingame admits to possessing the drugs in the tool bag found at the Habanero Way house and carrying a loaded firearm in connection with his possession and intended distribution of methamphetamine. The government objected, arguing that the plea agreement was inadmissible hearsay, and the court sustained the objection.

During closing arguments, the government relied on several pieces of Detective Koppman's testimony, including: (1) that Cook admitted to him that she was a drug distributor; (2) that Burlingame claimed not to have a key to the Alcazar Street house; and (3) that Cook was carrying a red purse containing a usable amount of methamphetamine and a large amount of cash when he first encountered her at the Alcazar Street house. Cook contends that all three pieces of testimony were uncorroborated at trial.[10] Ultimately, the jury convicted Cook on both counts, and the court sentenced her to 324 months in prison.[11] Cook now appeals.

---

[10] As mentioned, Sergeant Cooksey also testified about Cook's interview statement about her drug involvement and Phoenix supplier. And Cook's landlord testified that Cook and Solano, not Burlingame, resided in the home. At trial, the government introduced pictures of the red purse and its contents.

[11] Cook's guideline range was life imprisonment. Finding that a life sentence would be "a bit too harsh," the court granted a downward variance of 2 offense levels to an offense level of 41, which, when combined with Cook's criminal-history

**DISCUSSION**

Cook challenges the district court's exclusion of (1) cross-examination questions about Detective Koppman's search-warrant affidavit for Mr. Doe's property; (2) the contents of the Dungan Street search; and (3) Burlingame's plea agreement. We address each issue in turn.

### A. The Disputed Search-Warrant Affidavit

We consider first whether the district court violated Cook's Sixth Amendment Confrontation Clause rights by not allowing Cook to cross-examine Detective Koppman about the search-warrant affidavit.[12]

Before turning to the merits, we must determine the applicable standard of review. As noted before, "[t]here may be some tension within our circuit's precedents as to the proper standard of review for confrontation claims premised on cross-examination restrictions." *United States v. Mullins*, 613 F.3d 1273, 1283 n.4 (10th Cir. 2010). Generally, we review Confrontation Clause claims de novo if the district court precluded an "entire relevant area of cross-examination." *See United States v.*

---

category, resulted in a guideline sentencing range of 324 to 405 months. R. vol. 5 at 38–46.

[12] We note that Cook challenges the exclusion of questions about the Mr. Doe search-warrant affidavit not only during trial, but also during the suppression and sentencing hearings. But we have held that the Confrontation Clause does not apply during sentencing. *United States v. Bustamante*, 454 F.3d 1200, 1202–03 (10th Cir. 2006); *United States v. Hershberger*, 962 F.2d 1548, 1554 (10th Cir. 1992). And Cook does not direct us to any opinion from our court holding that the Confrontation Clause applies to suppression hearings. The parties did not brief this issue, so we do not decide it.

*Woodard*, 699 F.3d 1188, 1194 (10th Cir. 2012) (internal quotation marks and citation omitted). On the other hand, when the district court merely limited "the *extent* of cross-examination," we review for abuse of discretion. *See United States v. Valentine*, 706 F.2d 282, 288 (10th Cir. 1983). But as the parties' briefs highlight, our case law varies on what constitutes an "entire area" of cross-examination.[13] So "[a]t some point it may be appropriate to reexamine our standard of review." *See United States v. John*, 849 F.3d 912, 918 (10th Cir.), *cert. denied*, 138 S. Ct. 123 (2017). Because Cook's claim would fail under either standard, however, we need not resolve that dispute today. We therefore apply de novo review.

The Sixth Amendment guarantees criminal defendants the right to confront witnesses against them. U.S. Const. amend. VI. Although a district court "retain[s] wide latitude . . . to impose reasonable limits on such cross-examination," *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986), a court violates the Confrontation Clause when it prohibits the defendant from "engaging in otherwise appropriate cross-

---

[13] In some cases, we've defined the relevant subject area at a high level of generality, such as the witness's credibility. *See e.g.*, *United States v. Rosario Fuentez*, 231 F.3d 700, 704 (10th Cir. 2000) ("[The defendant] was not precluded from inquiring into an entire area of cross-examination, in this case, [the witness's] credibility."). In others, we've found matters within the realm of credibility, such as a witness's ability to perceive, to constitute an "entire area" of questioning under the Confrontation Clause. *See, e.g.*, *United States v. Robinson*, 583 F.3d 1265, 1269–75 (10th Cir. 2009) (holding that the district court precluded "an entire relevant area of cross-examination" when it prohibited the defendant from inquiring about the witness's mental-health condition as bearing on his ability to perceive, even though it permitted the defendant to impeach the witness about other aspects of his credibility, including his criminal history).

examination that, as a result, precludes him from eliciting information from which jurors could draw vital inferences in his favor." *Woodard*, 699 F.3d at 1194 (10th Cir. 2012) (internal quotation marks omitted). Significantly, to establish a Confrontation Clause violation, the defendant must prove that "[a] reasonable jury might have received a significantly different impression of [the witness's credibility had he] been permitted to pursue his proposed line of cross-examination." *Van Arsdall*, 475 U.S. at 680.

Applying a de novo standard of review, we next must determine whether the proposed questioning was "otherwise appropriate." The Supreme Court has not expressly defined what qualifies as "otherwise appropriate" cross-examination but rather has offered examples of "reasonable limits" that district courts "retain wide latitude" to impose. *Id.* at 679. Among these are "concerns about . . . harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Id.* Though our case law has generally looked to the Federal Rules of Evidence for guidance,[14] we note that evidentiary rules "may not be applied mechanistically to defeat" a constitutional right. *Chambers v. Mississippi*, 410 U.S. 284,

---

[14] *See, e.g.*, *Woodard*, 699 F.3d at 1194 (holding that a past judicial finding that the witness was not credible was "otherwise appropriate" under Rule 608(b)); *see also Robinson*, 583 F.3d at 1275 (finding that the proposed question about the witness's mental health condition and use of prescription medications was "otherwise appropriate" under Rule 403); *United States v. Turner*, 553 F.3d 1337, 1350 (10th Cir. 2009) (holding that, because "[t]he probative value of [the witness's] impeachment was substantially outweighed" by the danger of confusion under Rule 403, the "excluded cross examination was not 'otherwise appropriate'").

302 (1973); *see also United States v. Oliver*, 278 F.3d 1035, 1041 (10th Cir. 2001) (noting that the right to cross-examine witnesses "is potentially broad enough to require admission of evidence that is otherwise excludable under the Federal Rules of Evidence"); *United States v. Young*, 952 F.2d 1252, 1258 (10th Cir. 1991) ("An analysis under [Rule] 403 will not in all cases subsume the constitutional issue.").

Cook contends that her proposed cross-examination was "otherwise appropriate" under Rule 608(b), which "grants the trial court discretion to permit a witness to be cross-examined on specific instances of conduct probative of a witness' character for truthfulness or untruthfulness." *Bennett v. Longacre*, 774 F.2d 1024, 1027 (10th Cir. 1985). She argues that Detective Koppman's failure to correct CS2's mistake about who supplied Mr. Doe is a classic example of "paltering," whereby someone makes a "technically true statement to intentionally mislead." Cook's Opening Br. at 24. The government, meanwhile, urges us to conclude, as the district court did, that Detective Koppman's affidavit is not probative of a character for untruthfulness, because abundant probable cause existed to issue the warrant, even without any reference to CS2's mistaken belief. We agree with the government.

Here, reviewing de novo, we conclude that the evidence was not "otherwise appropriate," because it was "only marginally relevant" in assessing Detective Koppman's reliability. *See Van Arsdall*, 475 U.S. at 679; *see also John*, 849 F.3d at 916 (holding that a witness's previous drug use, suicidal thoughts and behavior, and inpatient stay at a behavioral health center were "not even marginally relevant" to her ability "to perceive, remember, or relate" a crime that occurred several months later). In view of the

14

controlled buy between Detective Koppman's CS1 and Mr. Doe, we conclude that Detective Koppman may simply not have realized that he was required to include in the affidavit CS2's mistaken view of the relationship between Mr. Doe and the named person (who Detective Koppman knew was CS1). We therefore conclude that the affidavit had, at most, marginal relevance in measuring Detective Koppman's reliability, here, his character for truthfulness, because it revealed no potential motive to lie.

Moreover, even assuming that the proposed cross-examination had more than marginal relevance for measuring Detective Koppman's reliability, the district court correctly excluded it because it would have likely confused the jury. *See Van Arsdall*, 475 U.S. at 679 ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . confusion of the issues."). Directing the jury's attention to Detective Koppman's alleged untruthfulness in a collateral matter would have resulted in "mini-trials on side issues," such as the strength of the affidavit without the incorrect statement about who supplied Mr. Doe, the probable-cause standard, and philosophical and sociological questions of what constitutes "untruthfulness." *See United States v. Beltran-Garcia*, 338 F. App'x 765, 772 (10th Cir. 2009). The inevitable confusion caused by such questioning would have made "it more difficult for the jury to render an impartial decision." *See id.* In short, Cook's proposed cross-examination was not "otherwise appropriate," and the Confrontation Clause is thus not implicated. *See Van Arsdall*, 475 U.S. at 679; *Turner*, 553 F.3d at 1350.

Cook argues that the district court erred by undervaluing the "centrality" of Detective Koppman's testimony throughout the proceedings. Cook's Opening Br. at 35; Cook's Reply Br. at 28–31. But the importance of Detective Koppman's testimony in Cook's trial would not render the Mr. Doe search-warrant affidavit any more probative of his character for untruthfulness. And though it may well be an error "not to allow such cross-examination in a criminal case where the vast majority of inculpatory evidence is based on a lone witness's testimony," this is not such a case. *See United States v. Torres*, 569 F.3d 1277, 1283 (10th Cir. 2009) (internal quotation marks omitted).

In this case, the star witnesses were the methamphetamine and the cash, as well as the law-enforcement officers who found Cook in control of those items. Though we agree that Detective Koppman was an important witness, he wasn't as important as Cook claims. First, Sergeant Cooksey also testified to hearing Cook speak about her methamphetamine source in Phoenix soon after being caught with six pounds of methamphetamine in her residence. Second, both Sergeant Cooksey and Detective Cotton testified that they found Cook at the Alcazar Street house, along with several of her identification cards in the same room where, before Detective Koppman had even been upstairs, Detective Cotton found several pounds of methamphetamine and tens of thousands of dollars in cash. Third, the jury watched a video of Cook recrossing the Mexican border. HSI Agent Jody Harrison identified Cook in the video and testified that she crossed using the same false identification documents for "Lara Baca" found at both searches. Agent Harrison also testified to finding Cook at the Habanero Way house, again

16

surrounded by methamphetamine. The jury also heard from Cook herself, in a phone call to Burlingame, proclaiming that she will "take all the charges." R. vol. 4 at 443.

Therefore, even if we viewed the importance of Detective Koppman's testimony as Cook does, we would agree with the district court's decision to exclude the proposed questioning, because it risked "confusion of the issues." *See Van Arsdall*, 475 U.S. at 679. So we conclude that the district court properly excluded cross-examination into the Mr. Doe search-warrant affidavit. *See id.* ("[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, . . . confusion of the issues.").

## B. The Dungan Street Search and Burlingame's Plea Agreement

Cook next argues that the district court abused its discretion in excluding the evidence recovered at the house on Dungan Street as irrelevant and excluding Burlingame's plea agreement as inadmissible hearsay. Cook sought to admit both pieces of evidence to support her defense that Burlingame was "solely responsible" for trafficking the drugs Cook was charged with and that, while Cook tolerated Burlingame's trafficking, she did not participate in it. In conclusory fashion, Cook maintains that, by excluding this evidence, the district court prevented her from putting on a full and fair defense.[15]

---

[15] "In general, the right to present a defense . . . is a fundamental element of due process of law." *John*, 849 F.3d at 917 (internal quotation marks omitted). But the Federal Rules of Evidence "do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 54 (1987)); *see also United States v. Tapaha*, 891

"We review evidentiary rulings for abuse of discretion," *United States v. Edward J.*, 224 F.3d 1216, 1219 (10th Cir. 2000), and we will not find an abuse of discretion "unless we develop a definite and firm conviction that the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances," *United States v. Levine*, 970 F.2d 681, 688 (10th Cir. 1992).

### 1. The Dungan Street Search

Cook argues that the Dungan Street search was relevant because it tended to negate her own guilt. Under Federal Rule of Evidence 404(b), evidence of "wrongs, acts, or crimes is admissible for defensive purposes if it tends, alone or with other evidence, to negate the defendant's guilt of the crime charged against him." *United States v. Montelongo*, 420 F.3d 1169, 1174 (10th Cir. 2005). Such evidence is often referred to as "reverse 404(b)" evidence because prosecutors, not defendants, typically invoke Rule 404(b). *Id.* "In the vast run of such cases, . . . [the probative value of reverse 404(b) evidence] is slight, as it may just amount to pointing a finger at someone else who, having a criminal record, *might* have committed the crime the defendant is accused of committing." *United States v. Murray*, 474 F.3d 938, 939 (7th Cir. 2007).

The Dungan Street search turned up disassembled laboratory equipment, six firearms, and several burner phones, which Cook believes is strong evidence that

---

F.3d 900, 905 (10th Cir. 2018) (noting that the right to present a defense "is not absolute; a defendant must still abide the rules of evidence and procedure") (internal quotation marks omitted).

Burlingame "was a large-scale drug trafficker." Cook's Opening Br. at 38. Because she wasn't found at Burlingame's house, Cook argued to the district court that the jury could reasonably infer that the drugs she was found with (at the Alcazar Street and Habanero Way houses) belonged *exclusively* to Burlingame. But the district court excluded the Dungan Street evidence as irrelevant because neither Cook nor Burlingame was charged based on any of the items found there. Cook argued that had Burlingame gone to trial, the government likely would have charged him based on evidence from the Dungan Street search. But the court noted that admitting the evidence would "open[] the door" to the government putting on a rebuttal case tying Cook to those same items because Cook had listed the Dungan Street house as her residence as part of her release on state charges. R. vol. 4 at 547.

Based on this record, we find no abuse of discretion in the district court's excluding evidence of the Dungan Street search. First, no drugs or cash were found at the Dungan Street house, and the residue found on the laboratory equipment was unidentified—hardly evidence that Burlingame was a "large-scale trafficker" of methamphetamine. *See* Fed. R. Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."). Moreover, unlike the *Montelongo* case cited by Cook, where the owner of the defendants' vehicle had previously been implicated in an incident involving "nearly identical conduct" with drugs packed into one of his vehicles in the same way in which the defendants had allegedly smuggled them, the Dungan Street evidence does not reveal any *modus operandi* specific

19

to Burlingame that would vindicate Cook. *See* 420 F.3d at 1176. If anything, the Dungan Street evidence would have incriminated Cook even more because she had listed the house as her home address and nothing in the record ties the items found there solely to Burlingame. To the extent Cook wished to point the finger at Burlingame, she could have called him as a witness, but she elected not to. We thus have no "firm conviction that the trial court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances" and find no abuse of discretion in the district court's exclusion of the Dungan Street search. *See Levine*, 970 F.2d at 688.

## 2. Burlingame's Plea Agreement

Finally, Cook appeals the district court's exclusion of Burlingame's plea agreement, in which he admits to possessing with intent to distribute the same methamphetamine that federal agents found at the Habanero Way house and that underlies Cook's charges.[16] Again, Cook wanted to introduce this evidence to prove that Burlingame, not Cook, was selling the drugs. To defeat the government's hearsay objection, Cook argued that the plea agreement was "an opposing party's statement" under Federal Rule of Evidence 801(d)(2).[17] At a minimum, she argued, the agreement

---

[16] Burlingame's plea agreement does not reference any of the items found at his house on Dungan Street.

[17] Rule 801(d)(2) exempts from the hearsay exclusion a statement that is offered against an opposing party and:

    (A) was made by the party in an individual or representative capacity;

    (B) is one the party manifested that it adopted or believed to be true;

was an adoptive admission under Rule 801(d)(2)(B) because the government presented it to the court as factually accurate. The court sustained the government's hearsay objection, finding that Cook had made a strategic decision not to call Burlingame as a witness and was "trying to get what would be [Burlingame's] testimony . . . before the Jury without having him testify and be subject to examination and cross-examination." R. vol. 4 at 554–55.

Even if we assume that a plea agreement is an opposing-party admission under Rule 801(d)(2)(B), we would not conclude that the district court abused its discretion in excluding it. First, the plea agreement was irrelevant. Burlingame's guilty plea for possessing the methamphetamine with intent to distribute it does not negate Cook's guilt for doing the same. As the evidence shows here, two people can jointly possess an object, including methamphetamine. *See* 10th Cir. Criminal Pattern Jury Instructions, No. 1.19 (2011 ed.) ("The fact that another person also may be guilty is no defense to a criminal charge."). And unlike Cook, Burlingame was not charged for the Alcazar Street methamphetamine. Admitting the plea agreement likely would have wasted time and confused the jury. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its

---

(C) was made by a person whom the party authorized to make a statement on the subject;

(D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

(E) was made by the party's coconspirator during and in furtherance of the conspiracy.

21

probative value is substantially outweighed by a danger of . . . confusing the issues [or] wasting time.").

In sum, because the record reveals that the plea agreement was not relevant and likely would have confused the issues and wasted time,[18] we find no abuse of discretion in the district court's exclusion of the agreement.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the district court.

Entered for the Court


Gregory A. Phillips
Circuit Judge

---

[18] The parties primarily argue about whether the plea agreement was hearsay, as opposed to its relevance or Rule 403 concerns, and the district court likewise ruled on hearsay grounds. But "we are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Roederer*, 11 F.3d 973, 977 (10th Cir. 1993) (internal quotation marks omitted).